David S. Casey, Jr., SBN 060768
*dcasey@cglaw.com*
Gayle M. Blatt, SBN 122048
*gmb@cglaw.com*
Jeremy Robinson, SBN 188325
*jrobinson@cglaw.com*
Seth Barron, SBN 325459
*sbarron@cglaw.com*
**CASEY GERRY SCHENK**
**FRANCAVILLA BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA  92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

*Attorneys for Plaintiff and the*
*Proposed classes*

[*Additional Counsel on Signature Page*]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Jordan Hull**, on behalf of himself and all other persons similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>**First American Financial Corporation** and **First American Title Company**,<br><br>                    Defendants, | CASE NO.<br><br>**Class Action Complaint for Damages**<br><br>**Demand for Jury Trial** |

1.    Every year millions of Americans buy a home. Buying a home requires turning over crucial personal identifying information ("PII") and valuable financial information, including social security numbers, income tax

information, and banking information. Any of this highly sensitive information, in the wrong hands, can be used to fraudulently open new accounts, use existing accounts, perpetrate identity fraud or impersonate victims in myriad schemes, all of which can cause grievous financial harm, wreck victim's credit scores for years, and cause victims to spend countless hours mitigating the impact

2.     Every year millions of Americans have their most valuable PII stolen and sold online because of massive data breaches of major corporations.  Yet, despite the dire warnings about the severe impact of data breaches on Americans of all economic strata, some companies *still* fail to put adequate security measures in place to protect their customers' data.

3.     Defendants First American Financial Corporation and First American Title Company (collectively "First American") are among those companies that have utterly failed to meet the basic but essential obligation to protect the personal and financial data entrusted to them by their customers.

4.     While First American promises cutting edge data security, it does not deliver. In its privacy policy, First American repeatedly promises to keep its customers' personal information safe and secure both online and offline in secure facilities with 24/7 monitoring. [1] The first heading in bold lettering under the "Privacy Info page is a message: "**We Are Committed to Safeguarding Customer Information**."[2]

5.     First American promises, "We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information … We currently

---

[1] https://www.firstam.com/mortgagesolutions/solutions/cleanfile-solutions/document-management.html
[2] https://www.firstam.com/privacy-policy/index.html

maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information."[3]

6.      These representations and promises were false. There was a dangerous and easily exploitable flaw in First American's website that put millions of users' most sensitive PII at risk. Gaining access to millions of user files only required changing the final digits of the "DocumentID" in the URL given to each customer to access their files. For example, a First American customer is sent a link giving them access to their documents, e.g., "DocumentID=0000005**4.** By changing the **4** to a **7**, **8**, **9** etc. one could instantly access 885 million private documents by going down the list.

7.      This security flaw is so basic, it is incomprehensible how a company that collects sensitive PII, much less one the size of First American, could allow it to exist.

8.      Plaintiff and the class members reasonably relied on First American's representations or omissions, both express and implied, in providing their PII.

9.      As a result of First American's misrepresentations and omissions regarding its data security, its breach of its own contractual terms, and its negligence in failing to provide adequate data security, the PII of Plaintiff and the class was exposed to the world for easy picking. Plaintiff and the class thus not only did not get the benefit of their bargain with First American—Plaintiff and the class paid substantial amounts for First American's services—they are also now at much higher risk for cybercrimes of all kinds.

## THE PARTIES

10.      Defendant First American Financial Corporation is a Delaware corporation with its principal place of business in Santa Ana, California.

---

[3] Id.

11.     Defendant First American Title Company is a California corporation with its principal place of business in Santa Ana, California. First American Title Company is a subsidiary of First American Financial Corporation.

12.     First American Financial Corporation and First American Title Corporation are "financial institutions" as defined in the California Financial Information Privacy Act, California Financial Code § 4050, et seq., and the Gramm-Leach-Bliley Act, Pub.L. 106–102, 113 Stat. 1338. As such, they are subject to those laws' data privacy protections.

13.     Plaintiff Jordan Hull is a resident of San Diego, California. He bought a home in August of 2010 and purchased title insurance from First America to cover the property. Plaintiff Hull reasonably believed First American would keep his PII secure. Had First American disclosed to Plaintiff Hull that his PII would not be kept secure and instead would be easily accessible to even the most novice hacker, he would not have chosen to use First American in his home buying transaction.

## JURISDICTION AND VENUE

14.     Subject matter jurisdiction in this civil action is authorized pursuant to 28 U.S.C. § 1332(d) because there are more than one hundred Class members, at least one class member is a citizen of a state different from that of Defendants, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

15.     This Court has personal jurisdiction over Defendants because they maintain their principal places of business in this District, are registered to conduct business in California, and have sufficient minimum contacts with California.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this District and a substantial part of the events

or omissions giving rise to Plaintiff's and Class members' claims occurred in this District.

17.     Application of California law to this dispute is proper because Defendants' headquarters are in California, the decisions or actions that gave rise to the underlying facts at issue in this Complaint were presumably made or taken in California, and the misconduct emanated from California. Additionally, Defendants' employees involved in the misconduct are presumably located at Defendants' headquarters.

## FACTUAL ALLEGATIONS

**A.     First American collects and stores the PII of millions of customers and then fails to provide even the most basic data security for it**

18.     First American is a behemoth in the title insurance industry. It ranked number 491 on 2019's 500 largest US companies with a revenue of $5.7 billion in 2018. [4] Apart from title insurance, First American also offers "lender's insurance", "mortgage solutions", "real estate data solutions", and "trust services." [5]

19.     Title insurance is meant to protect property owners: first, by discovering potential title issues (liens, claims, etc.) before they arise through a title search; and second, by defending the property owner against challenges to the validity and legality of title. Anyone looking for a home loan is required to purchase title insurance so the lender can protect itself if the seller encounters legal obstacles to transferring the title. A real estate owner may also choose to purchase title insurance to ensure there are no

---

[4] https://www.washingtonpost.com/technology/2019/05/24/security-blog-reports-that-first-american-left-hundreds-millions-records-exposed/?noredirect=on&utm_term=.776bcfe7dd2e
[5] https://www.firstam.com/index.html

1    issues with the title. [6]

2        20.    Title insurance is also very costly. As Forbes noted in 2006, First

3    American prices its title insurance at 1,300% above its margin cost. The

4    average policy with First American (in 2006) cost about $1,500 but running a

5    title search—now that records are available online—costs as little as $25.16.

6    And First American spends only about $75 per policy to pay claims. [7]

7        21.    Customers reasonably believe that, at a minimum, the large sum

8    they pay towards title insurance buys them security and peace of mind that

9    their sensitive documents will be securely stored. As Ben Shoval, the man

10   who discovered the First American breach, explains: "The title insurance

11   agency collects all kinds of documents from both the buyer and seller,

12   including Social Security numbers, driver's licenses, account statements …

13   You give them all kinds of private information and you expect that to stay

14   private."[8]

15   **B.    First American falsely represents it will keep customers' PII secure**

16       22.    First American promises its customers "Secure Online Access"

17   and claims to provide a document management program "aimed at

18   mitigating risk."[9] They even offer "Cyber Liability Insurance[10]" ironically,

19   designed in part to protect companies in the event of a data breach.

20       23.    In its privacy policy, First American repeatedly promises to keep

21   their customers' personal information safe and secure both online; and offline

---

[6] https://www.forbes.com/sites/jordanlulich/2018/06/21/what-is-title-insurance-and-why-its-important/#69dd61b312bb

[7] https://www.forbes.com/forbes/2006/1113/148.html#1d7603526627

[8] https://krebsonsecurity.com/2019/05/first-american-financial-corp-leaked-hundreds-of-millions-of-title-insurance-records/

[9] https://www.firstam.com/mortgagesolutions/solutions/cleanfile-solutions/document-management.html

[10] https://www.firstam.com/title/agency/agency-insurance/

in secure facilities with 24/7 monitoring. [11]

24.    The first heading on the "Privacy Info page states in bold lettering: "We Are Committed to Safeguarding Customer Information."[12]

25.    First American then promises, "We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information … We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information." [13]

26.    The claims would be material to consumers. The real estate business is rife with cyberfraud, with the FBI noting that from 2015 to 2017, there was a 1100% rise in the number of victims and a 2200% rise in losses[14]:



---

[11] https://www.firstam.com/privacy-policy/index.html
[12] https://www.firstam.com/privacy-policy/index.html
[13] *Id*.
[14] https://www.ic3.gov/media/2018/180712.aspx



27.     But, as alleged below, First Americans' representations were false. In fact, First American did not have even the most rudimentary form of security—no data encryption, no passwords, nothing.

28.     Further, First American stores its customers' PII "indefinitely": "We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis."[15] Meaning, once a customer has given First American his or her PII, that PII remains in First American's systems forever.

29.     "Former customers" are told: "Even if you are no longer our customer, our Privacy Policy will continue to apply to you.".[16]

## C.    First American exposes its customers' most sensitive PII to the world with absolutely no security

30.     On May 24, 2019, Brian Krebs from "KrebsOnSecurity"—a cybersecurity researcher—reported a massive vulnerability in the security of First America's website that would allow anyone to access over 880 million

---

[15] https://www.firstam.com/privacy-policy/index.html
[16] *Id.*

documents, with the earliest dating back more than 16 years. Krebs noted that, without password authentication even a "novice" level hacker could easily gain access to files containing bank account numbers, social security numbers, financial and tax records, and images of driver's licenses. [17]

31.     Krebs' report was based, in part, on information he received from real estate developer Ben Shoval, who first uncovered the security lapse. Mr. Shoval tried to contact First American to inform them that there was a problem, but First American failed to respond.

32.     As alleged previously, the security lapse allowed anyone to gain access to millions of user files by simply changing the end digit of the "DocumentID" in the URL, i.e., by changing the 54 in the "DocumentID=00000054" to any other number, a hacker could instantly access 885 million private documents.

33.     Krebs noted that the information exposed by First American "would be a virtual goldmine for phishers and scammers involved in so-called Business Email Compromise scams, which often impersonate real estate agents, closing agencies [and] title and escrow firms in a bid to trick property buyers into wiring funds to fraudsters." The FBI reports that these types of scams are one of the costliest forms of cybercrime today.[18]

---

[17] https://krebsonsecurity.com/2019/05/first-american-financial-corp-leaked-hundreds-of-millions-of-title-insurance-records/
[18] Federal Bureau of Investigation, Internet Crime Complaint Center, "2018 Internet Crime Report," https://www.ic3.gov/media/annualreport/2018_IC3Report.pdf

34.     The Business Email Compromise scam can take many different forms, but usually resembles the chart below:



35.     First American also ignored requests for comment from several media outlets. Instead, they released a public statement on their website on May 28, 2019, acknowledging the website's "design defect" that gave "unauthorized access to customer data." Currently the part of the website at issue is shut down pending an "internal review." First American's CEO also promised in the statement that, "they are thoroughly investigating the matter and are fully committed to protecting the security, privacy, and confidentiality of the information entrusted to us by our customers."[19]

36.     Although it has been shut down, security researcher John Wethington says that 6,000 of the documents are still accessible through search engine caches.[20]

---

[19] https://www.firstam.com/incidentupdate/update20190528.html
[20] https://techcrunch.com/2019/05/24/first-american-millions-sensitive-records/

37.     This exposure is tremendously problematic. Cybercrime is rising at an exponential rate, as shown in the FBI's Internet Crime Complaint statistics chart below:



38.     Following the announcement of the security vulnerability, the New York Department of Financial Services opened an investigation into the problem.[21] New York recently passed some of the toughest cybersecurity regulations which went into effect in March 2019. Financial companies must now report on measures they have put in place to protect sensitive data. Companies that willfully or recklessly violate these regulations will be subject to fines. [22]

---

[21] First American Mortgage Faces NY Regulator Inquiry, Lawsuit Bank Information Security, https://www.bankinfosecurity.com/first-american-faces-ny-regulator-lawsuit-over-exposure-a-12548 (last visited Jun 12, 2019)
[22] https://krebsonsecurity.com/tag/new-york-department-of-financial-services/

## CLASS ACTION ALLEGATIONS

39.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the following proposed Classes:

### A.     The Nationwide Class

40.     Plaintiff seeks to represent a proposed Nationwide class (the "Nationwide Class"), defined as follows:

> All persons in the United States who purchased First American's title insurance or used any of First American's other closing services.

### B.     The California Subclass

41.     Plaintiff seeks to represent a subclass comprised of California residents (the "California Subclass"), defined as:

> All persons residing in the state of California who purchased First American's title insurance or used any of First American's other closing services.

42.     Except where otherwise noted, "the Class" and "Class members" shall refer to members of the Nationwide Class and the California Subclass, collectively.

43.     Excluded from the proposed class are Defendants; any affiliate, parent, or subsidiary of Defendants; any entity in which Defendants have a controlling interest; any officer, director, or employee of Defendants; any successor or assign of Defendants; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

44.     **Numerosity**. Members of the proposed class likely number in the millions and are thus too numerous to practically join in a single action. Membership in the class is readily ascertainable from Defendants' own records.

45.   **Commonality and Predominance**. Common questions of law and fact exist as to all proposed class members and predominate over questions affecting only individual class members. These common questions include:

a.  Whether Defendants engaged in the wrongful conduct alleged herein;

b.  Whether Defendants' inadequate data security measures were a cause of the data security lapse;

c.  Whether Defendants owed a legal duty to Plaintiff and the other Class members to exercise due care in collecting, storing, and safeguarding their Personal Identifying Information;

d.  Whether Defendants negligently or recklessly breached legal duties owed to Plaintiff and the other class members to exercise due care in collecting, storing, and safeguarding their Personal Identifying Information;

e.  Whether Plaintiff and the Class are at an increased risk for identity theft because of the data security lapse;

f.  Whether Plaintiff and the Class have suffered benefit of the bargain losses because of the data security lapse;

g.  Whether Defendants' conduct violated Cal. Bus. & Prof. Code § 17200 et seq.;

h.  Whether Defendants' conduct violated the California Financial Information Privacy Act, Cal. Financial Code § 4050, et seq.;

i.  Whether Defendants' conduct violated the Gramm-Leach-Bliley Act, Pub.L. 106–102, 113 Stat. 1338;

j.  Whether Plaintiff and the other class members are entitled to actual, statutory, or other forms of damages, and other monetary relief; and

k.  Whether Plaintiff and the other class members are entitled to equitable relief, including, but not limited to, injunctive relief and

1    restitution.

2    46.    These issues not only predominate, they are also matters

3    appropriate for issue certification under Rule 23(c)(4).

4    47.    Defendant engaged in a common course of conduct giving rise to

5    the legal rights sought to be enforced by Plaintiff individually and on behalf

6    of the other Class members. Similar or identical statutory and common law

7    violations, business practices, and injuries are involved. Individual questions,

8    if any, pale by comparison, in both quantity and quality, to the numerous

9    questions that dominate this action.

10    48.    **Typicality:** Plaintiff's claims are typical of the claims of the other

11    Class members because, among other things, Plaintiff and the other Class

12    members were injured through the substantially uniform misconduct by

13    Defendant. Plaintiff is advancing the same claims and legal theories on behalf

14    of themselves and all other class members, and there are no defenses that are

15    unique to Plaintiff's.

16    49.    **Adequacy of Representation**: Plaintiff is an adequate

17    representative of the class because his interests do not conflict with the

18    interests of the other class members he seeks to represent; he has retained

19    counsel competent and experienced in complex class action litigation, and

20    Plaintiff will prosecute this action vigorously. The Class' interests will be

21    fairly and adequately protected by Plaintiff and his counsel.

22    50.    **Superiority:** A class action is superior to any other available

23    means for the fair and efficient adjudication of this controversy, and no

24    unusual difficulties are likely to be encountered in the management of this

25    matter as a class action. The damages, harm, or other financial detriment

26    suffered individually by Plaintiff and the other Class members are relatively

27    small compared to the burden and expense that would be required to litigate

28    their claims on an individual basis against Defendants, making it

impracticable for class members to individually seek redress for Defendants'
wrongful conduct. Even if class members could afford individual litigation,
the court system could not. Individualized litigation would create a potential
for inconsistent or contradictory judgments and increase the delay and
expense to all parties and the court system. By contrast, the class action
device presents far fewer management difficulties and provides the benefits
of single adjudication, economies of scale, and comprehensive supervision by
a single court.

### FIRST CAUSE OF ACTION

**Unlawful, Unfair, and Fraudulent Business Practices**

**Cal. Bus. & Prof. Code § 17200, et seq.**

**(on behalf of Plaintiff and the Nationwide and California Classes)**

51.     Plaintiff re-alleges the paragraphs above as if fully set forth
herein.

52.     Defendants violated and continue to violate California's Unfair
Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, et seq., which
prohibits unlawful, unfair, or fraudulent business acts or practices.

53.     Defendants' conduct, as alleged above, is unlawful because it
violates the Gramm-Leach-Bliley Act, the California Financial Information
Privacy Act, Section 5 of the Federal Trade Commission Act, and state data
security laws.

54.     Defendants' conduct is an unfair practice under the UCL because
it was immoral, unethical, oppressive, and unscrupulous and caused
substantial harm. This conduct includes failing to adequately ensure the
privacy, confidentiality, and security of consumer data entrusted to them and
failing to have even basic data security measures in place. Consumers were
harmed because they paid substantial sums of money for Defendants'
services, which included express and implied promises of adequate data

security, and Defendants failed to provide it.

55.     Instead, the PII of Plaintiff and the Classes, including their Social Security numbers and bank account information, were made accessible by Defendants to scammers, identity thieves, and other malicious actors, subjecting Plaintiff and the Classes to an impending risk of identity theft. Additionally, Defendants' conduct was unfair under the UCL because it violates the policies underlying the laws set out in the prior paragraph.

56.     The harm caused by Defendants' unfair practices outweighs any potential benefits from those practices. Further, there were reasonable alternatives available to Defendants to further their legitimate business interests.

57.     Defendants' conduct was "fraudulent" because it was likely to deceive a reasonable consumer. Defendants failed to disclose that they were not in compliance with the terms of their privacy policy or state and federal financial data security law.

58.     A reasonable person would not have agreed to use Defendants' services, knowing the truth about Defendants' poor data security. Had Defendants disclosed their nonexistent data security, Plaintiff would not have used Defendants' services or would have paid much less for them.

59.     As a direct result of Defendants' violations of the UCL, as set out above, Plaintiff and the Classes suffered injury in fact and lost money or property by overpaying for inadequate data security.

60.     As a direct result of Defendants' violations of the UCL, Plaintiff and the Classes are entitled to restitution and other equitable relief.

## SECOND CAUSE OF ACTION

### Negligence

### (on behalf of Plaintiff and the Nationwide and California Classes)

61.     Plaintiff repeats, re-alleges and incorporates by reference the

allegations contained in the paragraphs above as if fully set forth herein.

62.     By being entrusted by Plaintiff and the Class to safeguard their most sensitive PII during key financial transactions, including title insurance purchases, Defendants had a special relationship with Plaintiff and the Class. Plaintiff and the Class signed up for Defendants' services and agreed to provide their PII with the understanding that Defendants would take appropriate measures to protect it and would inform Plaintiff and the Class of any breaches or other security concerns that might call for action by Plaintiff and the Class. But, Defendants did not. Defendants are morally culpable, given their wholly inadequate safeguards.

63.     Defendants had a duty of reasonable care, both under common law and the Gramm-Leach-Bliley Act and the California Financial Information Privacy Act, to safeguard the privacy, confidentiality, and security of Plaintiff's and Class members' PII and to take reasonable measures to protect that PII. In addition, Defendants assumed a duty to Plaintiff and the Class by way of their privacy policy claims.

64.     Defendants breached these duties by failing to adequately safeguard the privacy, confidentiality, and security of Plaintiff's and Class members' personal information and documents.

65.     As a direct and proximate result of Defendants' breach of their duty of care, Plaintiff and the Class suffered injuries, as alleged above, in an amount subject to proof.

## THIRD CAUSE OF ACTION

### Breach of Contract

### (on behalf of Plaintiff and the Nationwide and California Classes)

66.     Plaintiff re-alleges the paragraphs above as if fully set forth herein.

67.     Plaintiff and Class members entered into a contract with First

American for the provision of title insurance or other closing services. Among the provisions of those contracts was a promise by Defendants to keep the PII of Plaintiff and the Classes secure in exchange for payment from Plaintiff and the Classes.

68.     In its privacy policy and elsewhere, Defendants expressly promised that it would safeguard its customers' PII. Defendants' represented: "We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information." Those federal regulations would include the pertinent provisions of the Gramm-Leach-Bliley Act.

69.     In giving Defendants their PII and paying for Defendants' services, Plaintiff and Class members performed what was required under the contract.

70.     Defendants, however, failed to perform their obligations under the contract, including failing to provide adequate security—or even any security—for Plaintiff's and the Classes' PII.

71.     Defendants' failure to perform the material terms of the contracts with Plaintiff and the Classes by allowing unauthorized access to their PII without any safeguards, is a breach of their contracts with Plaintiff and the Classes.

72.     As a direct result of First American's breach, Plaintiff and Classes did not receive the full benefit of the bargain, instead receiving services that were less valuable than described in their contracts.

73.     Also, because of Defendants' breach, Plaintiff and Classes have suffered actual damages due to the exposure of their PII, rendering them at substantially increased risk of identity theft. personal information, and they remain at imminent risk of suffering additional damages in the future.

## FOURTH CAUSE OF ACTION

### Breach of Implied Contract

### (On Behalf of Plaintiff and the Nationwide and California Classes)

74.    Plaintiff re-alleges the paragraphs above as if fully set forth herein.

75.    Plaintiff and the Classes bring this count in the alternative to the breach of contract cause of action.

76.    To the extent that Defendants' privacy policies did not form express contracts, the purchase of Defendant's title insurance or other financial products or services created implied contracts between Defendants and the user, the terms of which were set forth by the relevant privacy policies and related pages.

77.    Defendants breached such implied contracts by failing to adhere to the terms of the applicable privacy policies. Defendants violated their commitment to maintain the confidentiality and security of the PII of Plaintiffs and the Classes and failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security.

78.    Plaintiff and the Classes were harmed as the result of Defendants' breach of the implied contracts because they paid for services and guarantees that were worth less than was paid for them because of their lack of security.

79.    This breach of the implied contracts was a direct and legal cause of the injuries and damages to Plaintiffs and members of the Class as described above.

## FIFTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

### (On Behalf of Plaintiff and the Nationwide and California Classes)

80.    Plaintiff re-alleges the paragraphs above as if fully set forth herein.

81.     Under California law there is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.

82.     Under the express and implied terms of the agreements entered into between Defendants and Plaintiff and the Classes, Plaintiff and the Classes were to benefit through the use of Defendants' services, while those Defendants were supposed to benefit through payment for those services and the limited use of users' data for those services.

83.     Defendants exhibited bad faith through their conscious awareness of and deliberate indifference to the risks to Class members' PII, including by having virtually no security measures to protect sensitive PII that could easily be used to commit identity fraud and financial fraud and by exposing that PII to the world. In doing so, Defendants acted well outside of commercially reasonable norms.

84.     Defendants, by exposing their customers to vastly greater and more harmful exploitation of their PII than they had bargained for, breached the implied covenant of good faith and fair dealing with respect to both the specific contractual terms in the contracts and the implied warranties of their contractual relationships with their customers.

85.     Plaintiffs and the other Class members were harmed as the result of Defendants' breach of the implied covenant of good faith and fair dealing because their PII and financial information were exposed, and Defendants failed to provide the data security promised by Defendants.

### SIXTH CAUSE OF ACTION

### Unjust Enrichment

### (On Behalf of Plaintiff and the Nationwide and California Classes)

86.     Plaintiff re-alleges the paragraphs above as if fully set forth herein.

87.     Defendants received a benefit from Plaintiff and the Classes when they got payments for title insurance or other financial services. These benefits came at the expense of Plaintiff and the Classes because they paid substantial sums for Defendants' services.

88.     It would be unjust for Defendants to retain the benefits they received from Plaintiff and the Classes in relation to proper data security since Defendants did not provide any data security at all.

89.     Plaintiff and the Class seek disgorgement of Defendants' ill-gotten gains.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter a judgment awarding the following relief:

a.  An order certifying the proposed classes, and appointing Plaintiff's counsel to represent the classes;

b.  An order awarding Plaintiff and the Class members damages, restitution, disgorgement, and/or any other form of monetary relief provided by law;

c.  An order declaring Defendants' conduct to be unlawful;

d.  An order issuing a permanent injunction against Defendants;

e.  An order awarding Plaintiff and the Class's reasonable costs of suit;

f.  An order awarding Plaintiff and the Class pre-judgment and post-judgment interest as allowed under the law; and

g.  An order awarding such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, on behalf of themselves and the proposed Class, hereby demand a trial by jury as to all matters so triable.


Dated:  June 20, 2019              _/s/ Gayle M. Blatt_____
                                   GAYLE M. BLATT
                                   *Attorneys for Plaintiff*


**CASEY GERRY SCHENK**
**FRANCAVILLA BLATT & PENFIELD,**
**LLP**
110 Laurel Street
San Diego, CA  92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232
*dcasey@cglaw.com*
*gmb@cglaw.com*
*jrobinson@cglaw.com*
*sbarron@cglaw.com*


**TADLER LAW LLP**
Ariana J. Tadler
A.J. de Bartolomeo (SBN 136502)
Henry Kelston
Melissa Ryan Clark
One Pennsylvania Plaza
New York, New York  10119
Telephone: (212) 946-9300
Facsimile: (212) 273-4375
*atadler@tadlerlaw.com*
*ajdebartolomeo@tadlerlaw.com*
*hkelston@tadlerlaw.com*
*mclark@tadlerlaw.com*

Class Action Complaint